IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WORLD GROUP SECURITIES, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THELMA L. SANDERS, an individual,<br><br>Defendant. | ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION<br><br><br><br>Case No. 2:06-CV-00107 PGC |

Thelma Sanders initiated an NASD arbitration proceeding against World Group Securities, Inc. ("WGS") and two other parties after an annuity she purchased lost a significant portion of its value. In its complaint, WGS asks this court to declare that it is not subject to the NASD's jurisdiction because no signed contract with an arbitration clause exists between itself and Ms. Sanders, and that even if such a contract existed, the events Ms. Sanders complains of occurred before WGS existed as a corporate entity. WGS also asks the court to enjoin Ms. Sanders from pursuing further arbitration proceedings against it. Ms. Sanders asks the court to dismiss WGS's complaint and award attorney's fees.

After reviewing the pleadings and applicable law, the court GRANTS Ms. Sanders's motion to dismiss but DENIES the motion for attorney's fees. Based on the NASD's governing

code, a customer may compel arbitration if the customer has a dispute with an NASD member firm or its agent that relates to the firm's or agent's business activities.  Ms. Sanders meets both parts of this test because her NASD statement of claim seeks damages for WGS's failure to supervise Mr. William Styles, its former agent who handled Ms. Sanders's account.

## FACTS

The facts relevant to this dispute are largely undisputed and may be succinctly stated.  In December 1999, Ms. Sanders, a widow in her late seventies, invested approximately $300,000 into an American Skandia variable annuity.  Her investment agent, Mr. William Styles, was at that time a registered representative of WMA Securities.  The agreement she signed with WMA Securites when she opened her account contained an explicit arbitration provision.

As many are aware, the stock market bubble of the late 1990s burst shortly after Ms. Sanders bought the annuity.  Her money, which she alleges was improperly invested in unsuitable investments, quickly vanished.

On May 6, 2001, WMA Securities and WGS's parent company executed an asset purchase agreement.  Under the agreement, WGS purchased certain assets from WMA Securities, including Ms. Sanders's account.  WGS began operations as an NASD member broker-dealer on April 12, 2002.  The pleadings do not set forth the exact date, but at some point after WGS began operations, it hired Mr. Styles as one of its agents.  WGS became the broker-dealer on Ms. Sanders's variable annuity account when Mr. Styles accepted employment there.  When her account was transferred, she did not sign a new agreement with WGS that contained an explicit arbitration clause.

The asset purchase agreement specifically outlined which assets and obligations WGS would assume. Of particular relevance, WGS "did not assume any liability whatsoever with respect to any obligations, commitments or liabilities that arose prior to the . . . closing or are based upon, or arise from, occurrences or transactions prior to the . . . Closing Date."[1]

Around October 2003, after Ms. Sanders sustained massive losses in her account, she fired Mr. Styles and hired another WGS representative, Mr. William Billings, to manage her account. In January 2004, WGS terminated Mr. Styles's employment. Later that year, the NASD suspended Mr. Styles and then permanently banned him from the industry.

In December 2005, Ms. Sanders initiated arbitration before the NASD. She named WGS, Mr. Styles's former supervisor, and American Skandia Marketing as respondents. She sought damages for violations of various Utah securities laws, breach of fiduciary duty, breach of contract, negligence, and negligent supervision. She also sought punitive damages.

WGS objected to being named in the arbitration for two main reasons. First, it claimed that Ms. Sanders never signed a contract with WGS that contained an arbitration clause. Second, WGS cited its asset purchase agreement with WMA Securities, which specifically disclaimed liability for conduct that occurred in WMA accounts before the 2002 closing date. Based on these two points, WGS claimed that Ms. Sanders could not compel it to participate in NASD arbitration proceedings and asked her to voluntarily dismiss her arbitration proceeding. She refused to do so.

---

[1] Compl. ¶ 10.

Based on Ms. Sanders's refusal, WGS filed this suit seeking a declaratory judgment that it is not subject to the jurisdiction of the NASD and that Ms. Sanders cannot compel it to participate in the arbitration. It also asks the court to preliminarily and permanently enjoin Ms. Sanders from pursuing any claims against WGS in the arbitration. Ms. Sanders, in response, asks the court to dismiss WGS's complaint, though she does not specify the grounds upon which it should do so.[2] She also asks for attorney's fees as sanctions.

## PROCEDURAL POSTURE

As just noted, WGS seeks declaratory and injunctive relief while Ms. Sanders seeks dismissal of WGS's complaint. The court will not set forth or analyze the well-known injunction factors since its legal conclusions favor Ms. Sanders, thereby eliminating any possible finding of likelihood of success on the merits.[3] Instead, it will attempt to discern from Ms. Sanders's motion the proper rule under which to dismiss the complaint.

Rule 7-1 of the Local Rules of Civil Procedure requires all motions to "state the grounds for the request and cite applicable rules, statutes, or other authority justifying the relief sought."[4] This requirement is not procedural pedantry. Compliant motions set forth the relevant legal standard against which opposing counsel must contend and under which the court must operate.

---

[2]The memo also fails to comply with DUCivR 10-1(a) because it is single spaced.

[3]*See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76 (10th Cir. 2004).

[4]DUCivR 7-1(b)(1).

As such, compliant motions conserve valuable judicial resources and allow the court to craft more well-reasoned orders.

Here, Ms. Sanders's motion appears to argue for dismissal under Rule 12(b)(6). Ms. Sanders's arguments do not reference jurisdiction, venue, or service; Rules 12(b)(1) through (5) thus appear inapposite. Rule 12(c) is inapplicable by its terms since Ms. Sanders has not filed an answer and closed the pleadings.[5] And there is no need for the court to convert the motion to one for summary judgment under Rule 56. The court has reviewed only WGS's complaint; the complaint's exhibit, which "is considered part of the complaint and may be considered in a Rule 12(b)(6) dismissal"[6]; and the parties' memoranda supporting and opposing the two motions. Therefore, the court will treat Ms. Sanders's motion as one for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure and accept all well-pleaded allegations, taken in the light most favorable to the non-moving, party, as true.[7] But any allegations in the complaint that mischaracterize or misstate the plain language of an exhibit to the complaint are not "well-pleaded" and need not be taken as true.

---

[5]*See* Fed. R. Civ. P. 7(a).

[6]*Hall v. Bellmon*, 935 F.3d 1106, 1112 (10th Cir. 1991).

[7]*E.F.W. v. St. Stephen's Indian High Sch.*, 264 F.3d 1297, 1305 (10th Cir. 2001).

**DISCUSSION**

I.   **The Parties Agree that This Court, Rather than an Arbitrator, Should Decide Whether an Arbitration Agreement Exists.**

WGS and Ms. Sanders both agree that the issue of whether an arbitration agreement exists between them is a matter for this court, not an arbitrator, to decide.[8] They cite *Howsam v. Dean Witter Reynolds, Inc.*[9] in support of that proposition. In *Howsam*, the United States Supreme Court said, "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"[10] The court agrees that it is the proper entity to answer this question because no "clear and unmistakable" evidence indicates the parties intended an arbitrator to decide it. On that basis, the court proceeds to the central question: may Ms. Sanders compel arbitration with WGS? As discussed below, the court holds that she may.

II.   **Ms. Sanders Can Compel WGS to Arbitrate Before the NASD.**

WGS argues that Ms. Sanders cannot compel it to arbitrate before the NASD because (1) the events of which Sanders complains happened before WGS existed, and (2) there is no signed contract between the parties compelling arbitration. The court disagrees with both assertions.

A.   *Ms. Sanders's Claims Relate to Events that Occurred After WGS Was Organized.*

Throughout its brief, WGS repeatedly states that Ms. Sanders's claims relate only to her initial 1999 investment. In December of that year, Ms. Sanders bought an American Skandia

---

[8]*See* Doc. No. 3, at 9; Doc. No. 10, at 6.

[9]537 U.S. 79 (2002).

[10]*Id.* at 83 (quoting *AT&T Tech., Inc. v. Commc'n Workers*, 475 U.S. 643, 649 (1986)).

-6-

annuity from Mr. William Styles, who then was a registered representative of WMA Securities. At that time, WGS did not yet exist; it began operations as an NASD member broker-dealer April 12, 2002, after it purchased specific assets (including Ms. Sanders's account) from WMA Securities.  Since Mr. Styles became a registered representative of WGS *after* Ms. Sanders's 1999 purchase, and since WGS did not exist until 2002, WGS argues that it cannot be liable for any alleged wrongdoing in connection with the 1999 investment.

WGS reads Ms. Sanders's NASD statement of claim too narrowly.  In her summary of the claim, Ms. Sanders states: "The high risk nature of the portfolio should have and would have been detected by any broker with even a simple supervisory process for generating exception reports, yet the Respondents wholly failed to supervise the broker."[11]  Later in her claim, Ms. Sanders alleges that

> [t]hroughout this ordeal, the Respondents wholly *failed to monitor and supervise* Mr. Styles, or take simple actions to correct what was clearly a total mismatch between the investment questionnaire and how her account was invested, in fact almost a total black and white difference, which should have been revealed in a simple and standard process to generate an "exception report" — a warning from *the company* that standard rules and requirements had been drastically violated.[12]

The plain language of Ms. Sanders's claims thus indicates she seeks redress not just for the alleged improper investments Mr. Styles made in 1999, but also for the alleged failure of Mr. Styles's broker-dealers — which, after 2002, was WGS — to supervise him.  Indeed, Ms.

---

[11] Compl., Ex. 1, at 2.

[12] *Id.* at 14 (emphases added).

Sanders's NASD statement of claim alleges negligent supervision.[13]  As such, WGS incorrectly argues that Ms. Sanders complains only of events that predate WGS's existence.

      B.      *The NASD Code of Arbitration Creates an Enforceable Arbitration Contract.*

WGS argues that Ms. Sanders cannot compel arbitration because there is no signed agreement between WGS and Sanders that contains an arbitration clause.  WGS bases its argument almost entirely on two cases: *Wheat, First Securities, Inc. v. Green*,[14] an Eleventh Circuit case from 1993, and *Gruntal & Co. v. Steinberg*,[15] a 1994 case from the United States District Court for the District of New Jersey.  Were these two cases the only ones to address the issue here, the court might well grant WGS's motion.  Cases decided after *Wheat, First* and *Gruntal*, however, compel the court to dismiss its complaint.

As WGS correctly states, "'[a]bitration 'is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"[16]  Recent cases, however, almost uniformly hold that "even if 'there is no direct written agreement to arbitrate . . . , the [NASD] Code serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants.'"[17]  Courts cite NASD Rules 10101 and

---

[13] *Id.* at 15.

[14] 993 F.2d 814 (11th Cir. 1993).

[15] 854 F. Supp. 324 (D.N.J. 1994).

[16] *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (quoting *Commc'n Workers*, 475 U.S. at 648).

[17] *MONY Secs. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (quoting *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004)); *see also Vestax Secs. Corp. v. McWood*, 280 F.3d 1078, 1081 (6th Cir. 2002).

10301(a) to support the theory that the code itself is an arbitration agreement. "Rule 10101, entitled 'Matters Eligible for Submission,' provides 'for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association . . . between or among members or associated persons and public customers, or others.'"[18] Rule 10301(a), in turn, states:

> Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.[19]

Based on these two sections, courts have fashioned a two-part test

> that must be satisfied to trigger the NASD arbitration requirement. First, the claim must involve a dispute between either an NASD-member and a customer, or an associated person and a customer. Second, the dispute must arise in connection with the activities of the member or in connection with the business activities of the associated person.[20]

The allegations here show that Ms. Sanders satisfies these two requirements and may therefore compel WGS to arbitrate.

   1.   Ms. Sanders Was a Customer of WGS.

Whether a claimant is a customer of an NASD-member firm or its associates "is a legal question of contract interpretation for the Court."[21] The contract here is the NASD Code, which

---

[18] *Bornstein*, 390 F.3d at 1343.

[19] NASD Code of Arb. Proc. § 10301(a).

[20] *McWood*, 280 F.3d at 1081; *see also Bornstein*, 390 F.3d at 1343.

[21] *King*, 386 F.3d at 1368.

defines "'customer' to include anyone who is not a broker or a dealer."[22] Ms. Sanders never was a broker or a dealer. Thus, under the "plain language" of the NASD rules,[23] Ms. Sanders was a "customer" of WGS. "[N]othing in the Code directs otherwise or requires more."[24]

*Wheat, First* supports this finding. *Wheat, First* held that "customer" status "must be determined as of the time of the events providing the basis for the allegations."[25] Ms. Sanders's claims are not, as discussed, related solely to Mr. Styles's 1999 purchases. She also seeks damages for negligent supervision, and the "events providing the basis for" those allegations occurred after WGS bought WMA Securities in April 2002, hired Mr. Styles, and undertook regulatory supervisory responsibility for Styles's actions.

    2.    <u>Ms. Sanders's Dispute Arises in Connection with WGS's Activities.</u>

WGS argues that Ms. Sanders's claims do not arise in connection with its business because they relate to Mr. Styles's 1999 investments, which occurred before WGS was formed. Again, WGS reads Sanders's claims too narrowly. Ms. Sanders seeks damages for WGS's allegedly negligent supervision of Mr. Styles between its formation in 2002 and the time Mr. Styles left its employ. Each case this court found that considered this issue held "that supervision of associated persons arises in connection with the member's business."[26] After WGS was

---

[22] *Bornstein*, 390 F.3d at 1344 (citing NASD Rule 0120(g)).

[23] *John Hancock Life Ins. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001).

[24] *King*, 386 F.3d at 1368.

[25] *Wheat, First*, 993 F.2d 814.

[26] *Bornstein*, 390 F.3d at 1345 (citing cases).

formed and became an NASD member firm in 2002, Mr. Styles became its agent — an "associated person" over whom it had supervisory duties. This undisputed fact compels the court to conclude that Ms. Sanders's dispute arises in connection with WGS's activities. Ms. Sanders therefore satisfies the second of the two-prong test to compel arbitration.

      3.    Why *Wheat, First* and *Gruntal* Do Not Govern This Case.

WGS preliminary injunction motion is replete with references to *Wheat, First* and *Gruntal*; its position is based almost entirely on these two cases. The court will therefore briefly state why those two cases are not controlling here even though they contain similar facts.

*Wheat, First* involved a dispute between investors and an NASD member brokerage firm that was the successor-in-interest to Marshall Securities, the plaintiff investors' original brokerage firm. The investors opened accounts with an agent who first worked for Marshall and then for the successor firm. While at Marshall, the agent purchased stocks in the investors' accounts that later lost their value; the successor firm was not involved in any way with the transactions.

When the successor firm purchased Marshall, the asset purchase agreement specifically disclaimed liability for all obligations arising from Marshall's customer accounts. Despite this limitation, the investors sued the successor firm for the actions their agent took (buying the then-worthless stocks) while still a Marshall employee.[27]

The successor firm made the same argument that WGS does here — that is, investors could not compel it to arbitrate disputes that arose from the actions its agent took while employed

---

[27] *See Wheat, First*, 993 F.2d at 815–16.

by the firm's predecessor in interest. The court noted the "tantalizing" question of whether the NASD rules themselves required the successor firm to arbitrate the dispute, but "le[ft] its resolution for another day because" the case could "be disposed of on narrower grounds."[28] Specifically, the court held that the investors were not "customers" of the successor firm because all the malfeasance the investors complained of — namely, the stock buys — occurred before the predecessor in interest was formed.[29]

In *Gruntal*, investors likewise initiated arbitration against a successor firm for "acts and omissions made by" agents of the predecessor firm.[30] The asset purchase agreement between the predecessor and successor firms in *Gruntal*, just like the ones in *Wheat, First* and this case, disclaimed any liability for the successor firm due to obligations stemming from the predecessor firm's accounts.[31] The *Gruntal* court ruled that the investors could not compel the successor firm to arbitrate because "it never expressly assumed [the predecessor's] duty to arbitrate" and because "the Arbitration Proceedings involved transactions and events which took place on or before 15 February 1988, over two months prior to the Closing Date."[32]

Two important facts distinguish these cases from the present one. First, in *Wheat, First* and *Gruntal*, *all* the alleged wrongdoings occurred before the successor NASD members

---

[28]*Id.* at 820.

[29]*Id.*

[30]854 F. Supp. at 331.

[31]*Id.* at 329.

[32]*Id.* at 335.

purchased the predecessors.  Here, however, Ms. Sanders complains that WGS failed to properly supervise Mr. Styles *after* it was formed in 2002 and *after* Styles became its agent.  Ms. Sanders therefore complains both of Mr. Styles's conduct and WGS's omissions.  Second, *Wheat, First* and *Gruntal* did not decide whether NASD member firms had to submit to arbitration — even in the absence of a signed agreement — based solely on the NASD's governing code.  Since those two cases were decided, the Second,[33] Fourth,[34] Fifth,[35] Sixth,[36] and Eleventh[37] Circuits have all answered that question affirmatively and held that a customer may compel arbitration with an NASD member firm, even without a signed arbitration agreement, when a "customer" has a dispute with the firm or its agent that "relates to the firm's or agent's business activities."  The Tenth Circuit apparently has not yet addressed this issue, but this well-developed body of circuit precedent is persuasive here.

If Ms. Sanders sought damages only for her original 1999 investment, *Wheat, First* and *Gruntal* might entitle WGS to the relief it seeks.  But Ms. Sanders's allegations go beyond one incident.  As such, the circuit cases after *Wheat, First* convince the court that Ms. Sanders may compel WGS to arbitrate.  This holding, of course, "determine[s] only whether [Ms. Sanders]

---

[33] *See, e.g.*, *Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863–64 (2d Cir. 1994).

[34] *Washington Square Sec. Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).

[35] *California Fina Group, Inc. v. Herrin*, 379 F.3d 311, 317–18 (5th Cir. 2004).

[36] *McWood*, 280 F.3d at 1081.

[37] *Bornstein*, 390 F.3d at 1342; *King*, 386 F.3d at 1367.

may compel [WGS] to defend [her] claims in the arbitral forum, not whether [the court] 'deem[s]' those claims 'meritorious.'"[38]

## CONCLUSION

The court GRANTS Ms. Sanders's motion to dismiss (# 8) and DENIES WGS's motion for a permanent injunction (# 2). The court DENIES Ms. Sanders's motion for attorney's fees (# 8). The clerk's office is directed to close the case.

SO ORDERED.

DATED this 8th day of May, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[38] *John Hancock*, 254 F.3d at 57 (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)).